IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
TRI-STATE ENERGY SOLUTIONS,        :
LLP,                               :
                                   :
          Plaintiff,               :
                                   :
    v.                             : Civil Action No. 08-209-JJF
                                   :
KVAR ENERGY SAVINGS, INC.,         :
                                   :
          Defendant.               :
```

Leo John Ramunno, Esquire, Wilmington, Delaware.

Attorney for Plaintiff Tri-State Energy Solutions.

William J. Heller, Esquire of McCARTER & ENGLISH, LLP, Newark,
New Jersey.
A. Richard Winchester, Esquire and Daniel M. Silver, Esquire of
McCARTER & ENGLISH, LLP, Wilmington, Delaware.

Attorneys for Defendant KVAR Energy Savings, Inc.

**MEMORANDUM OPINION**

December $\underline{16}$, 2008
Wilmington, Delaware

Farnan, District Judge

Presently before the Court is Defendant's Motion To Dismiss
For Lack of Personal Jurisdiction Or In The Alternative To
Transfer To The Middle District of Florida.  (D.I. 2.)  For the
reasons discussed, the Court will deny Defendant's Motion.

## BACKGROUND

## I.  Procedural Background

Plaintiff Tri-State Energy Solutions, L.L.P. ("Tri-State")
brought this action on November 19, 2007, in the Delaware Court
of Chancery, alleging breach of contract and related tort
claims.  Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446,
Defendant KVAR Energy Savings, Inc. ("KVAR") removed the action
to this Court.  KVAR then brought the instant Motion To Dismiss
for lack of personal jurisdiction or, in the alternative, to
transfer to the Middle District of Florida.

On January 17, 2008, KVAR filed a complaint against Tri-
State and its co-presidents in the Middle District of Florida,
alleging breach of contract, three violations of the Lanham Act,
and a number of related tort claims.  Included among these
claims is one for breach of a non-disclosure agreement ("NDA")
that contained a forum selection clause mandating that disputes
related to breach of the NDA be litigated in Florida.  As set
forth in greater detail below, both the Delaware and Florida
actions arise from the deterioration of a business relationship

1

between KVAR and Tri-State in which Tri-State was to be a
regional distributor of KVAR products.

## II. Factual Background

Defendant KVAR is a Florida corporation with its principal
place of business in Port Orange, Florida. (D.I. 4 at 3.) KVAR
is a manufacturer and retailer of KVAR Energy Controller Units,
which improve the energy efficiency of residential and
commercial buildings. (Id.) Plaintiff Tri-State is a Delaware
limited liability corporation that, for a time, acted as a
distributor of KVAR products in Pennsylvania, Maryland, and
Delaware. (D.I. 5 at 6-7.)

The relevant history of the parties' interaction is as
follows. In December of 2005, Lawrence Gillen ("Gillen"), a
Delaware resident, learned of KVAR while searching for an energy
savings device to use in connection with his wife's retail
business. (D.I. 5 at 4.) Upon contacting KVAR, KVAR informed
Gillen that it typically did not sell products on a retail basis
to end users, but nonetheless agreed to sell Gillen two units
for his wife's store, which Gillen paid for using a credit card
belonging to Summit Liquors, a business owned by Gillen. (Id.;
D.I. 3 ¶ 12.) The sale was conditioned on Gillen signing an
NDA, which contained a forum selection clause specifying that
any disputes arising from a breach of the NDA be litigated in a

2

federal or state court having jurisdiction over Volusia County, Florida. (D.I. 4 at 5.)

Shortly thereafter, Gillen decided to pursue the possibility of becoming a distributor of KVAR products in Delaware. (D.I. 5 at 5.) However, given Gillen's lack of experience as an electrician, KVAR was initially reluctant to partner with him. (Id.) Gillen then approached Joseph Chieffo ("Chieffo"), a friend of his who was an experienced electrical contractor, about starting a company to sell KVAR products in Delaware. (Id.) Chieffo agreed. Gillen and Chieffo then formed Tri-State in March of 2006 and approached KVAR about acting as a Delaware distributor of KVAR products. (Id. at 6.) At this point, KVAR was more receptive, and Gillen and Chieffo traveled to Florida for a meeting with KVAR on March 17, 2006.

At the Florida meeting, Chieffo executed the same NDA that Gillen signed in December of 2005. (D.I. 4 at 5.) In addition, the parties entered into an "Exclusive Distributor Agreement" covering the state of Delaware. The agreement explains that "KVAR desires to appoint [Tri-State] . . . as a Exclusive Distributor of KVAR's products . . . ." (D.I. 4, Exh. C at 1.) Under the agreement, Tri-State was to pay an initial "distributor's fee" of \$18,500 in exchange for Delaware distribution rights and a small package of promotional/demonstrative materials. (Id.) In addition, Tri-

3

State agreed to order at least $7,500 worth of KVAR products in every three-month period during the first two years of the agreement, increasing to $15,000 in every three-month period thereafter. (Id. at 3.) KVAR would further be allowed to impose sales quotas on Tri-State. (Id.) The agreement provided that goods would be priced "FOB KVAR plant," and that "[r]isk of loss due to damage or destruction of KVAR Products shall be borne by [Tri-State] after delivery to the carrier for shipment." (Id. at 2.) For its part, Tri-State agreed to provide one to two weeks of training in the technology underlying KVAR products. (Id. at 2-3.) Tri-State alleges that a representative of KVAR, Gregory Taylor, traveled to Delaware on four occasions to visit Tri-State and, presumably, provide this training. (D.I. 5 at 6-7.) In addition, KVAR agreed to provide Tri-State with information regarding the limited warranty it extended to the original consumer of KVAR products and indemnify Tri-State for any claims arising from defects in KVAR products. (D.I. 4, Exh. C at 3-4.)

In May of 2006, the parties expanded their relationship, entering into a "Regional Distributor Agreement" that expanded the geographic scope of Tri-State's distribution rights to include Maryland and Pennsylvania, increased the startup fee to $25,000, and enlarging Tri-States's minimum mandatory order ten-fold to $75,000. (D.I. 4, Exh. D.) The "Regional Distributor

Agreement" was otherwise the same as the previous "Exclusive
Distributor Agreement." (D.I. 4 at 7.) Notably, though
including a choice of law provision, neither the "Regional
Distributor Agreement" nor the "Exclusive Distributor Agreement"
included a forum selection clause.

At some point thereafter, the parties' business
relationship broke down. Tri-State initiated litigation in
Delaware, and KVAR initiated litigation in Florida.

## THE PARTIES' CONTENTIONS

In general, KVAR alleges that it simply has no meaningful
connection to Delaware. Specifically, KVAR has no offices or
business operations in Delaware and no personnel that regularly
work or reside in Delaware. (D.I. 4 at 3.) Though KVAR entered
into a distribution agreement with Tri-State, KVAR contends that
this contact is insufficient to establish jurisdiction. (Id. at
13.) KVAR contends that to the extent it supplied Tri-State
with KVAR products, title to all goods passed in Florida, such
that it would not be deemed to have performed any acts in
Delaware. (Id. at 13-14.) KVAR further adds that "the mere
contracting with an entity that is incorporated in Delaware does
not provide the necessary nexus between the contract and the
forum to support a finding of jurisdiction." (Id.) Finally,
KVAR points to the forum selection clause in the NDA, alleging
that because Gillen and Chieffo control Tri-State and because

5

the NDA is "related to" the instant dispute, the forum selection
clause binds Tri-State in the instant action, despite the fact
that Gillen signed the NDA months before Tri-State even existed.
(Id. at 5-6.)

     On the issue of personal jurisdiction, Tri-State responds
by providing a factual summary, which it drew verbatim from a
brief in the parallel Florida action.  This summary outlines the
events leading up to the formation of the distributorship
agreement and briefly describes a few aspect of the parties'
business relationship.  Supposedly, this summary makes it
obvious that this Court has jurisdiction.  (See D.I. 5 at 4-7.)

     With respect to transfer pursuant to 28 U.S.C. § 1404, KVAR
argues that Tri-State's choice of forum is entitled to no
deference because the forum selection clause in the NDA
contractually requires Tri-State to litigate in Florida.  KVAR
alleges that the "entire dispute" between KVAR and Tri-State
involves claims "related to" the NDA, such as claims for
misappropriation of confidential information that KVAR is
raising in the Florida action.  (D.I. 4 at 20.)  KVAR further
contends that Tri-State is not entitled to "first filed" status
under the "first to file" rule because its Delaware filing was a
bad faith preemptive filing designed simply to avoid having to
litigate in Florida.  (Id. at 23-24.)  KVAR further notes that a
Florida court is more familiar with the Florida law that will

6

govern this dispute pursuant to the choice of law provisions in the parties' distributor agreements. (Id. at 25-26.) Other than KVAR's preference for Florida litigation, KVAR identifies no other factors that weigh in favor of transfer to Florida.

On the issue of transfer, Tri-State's briefing, which relies exclusively on Florida law, sets forth the general position that "Delaware and the surrounding area was the locale where all operative facts occurred." (D.I. 5 at 9-10.) Accordingly, Tri-State contends that witnesses and physical evidence are more readily available in Delaware and, compared to Florida, Delaware has a stronger local interest in adjudicating this dispute.

## DISCUSSION

## I. Motion To Dismiss For Lack of Personal Jurisdiction

In order for personal jurisdiction to exist over a defendant, two requirements, one statutory and one constitutional, must be satisfied. First, a federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state. Fed. R. Civ. P. 4(e). Therefore, the Court must determine whether there exists a statutory basis for finding jurisdiction under the Delaware long-arm statute. See 10 Del. C. § 3104. Second, because the exercise of jurisdiction must also comport with the Due Process Clause of the United

States Constitution, the Court must determine if an exercise of jurisdiction violates defendants' constitutional right to due process. Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945).

Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction. Provident Nat'l Bank v. California Federal Savings & Loan Assoc., 819 F.2d 434, 437 (3d Cir. 1987). To satisfy this burden, the plaintiff must establish either specific jurisdiction or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities within the forum state, while general jurisdiction arises when the defendant has continuous and systematic contacts with the state, regardless of whether the defendant's connections are related to the particular cause of action. Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 416, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). "When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor." L'Athene, Inc. v. Earthspring LLC, 570 F. Supp. 2d 588 (D. Del. 2008).

8

## A. Delaware Long-Arm Statute

The Delaware Supreme Court has construed the long-arm statute liberally to confer jurisdiction to the maximum extent possible in order "to provide residents a means of redress against those not subject to personal service within the State." Kloth v. Southern Christian University, 494 F.Supp.2d 273, 278 (D. Del. 2007) (quoting Boone v. Oy Partek Ab, 724 A.2d 1150, 1156-1157 (Del. Super. 1997)). The Delaware long-arm statute provides, in relevant part:

(c) As to any cause of action brought by any person arising from any of the act enumerated in the section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
(1) Transacts any business or performs any character of work or service in the state;
(2) Contracts to supply services or things in this State;
. . . .

Del. Code Ann. tit. 10 § 3104(c). The Delaware Supreme Court has interpreted §§ 3104(c)(1) and 3104(c)(2) as specific jurisdiction provisions that require a "nexus" between the plaintiff's cause of action and the defendant's "transaction of business or performance of work" used as the basis for jurisdiction. See LaNuova D & B, S.p.A v. Bowe Co., 513 A.2d 764, 768 (Del. 1986). Furthermore, where jurisdiction is asserted on a transactional basis, "even a single transaction is sufficient if the claim has its origin in the asserted transaction." Id. Where "the claim sought to be asserted

arose from the performance of business or the discharge of [a] contract, no further inquiry is required concerning any other indicia of the defendant's activity in this state." Id.

The Court concludes that KVAR has, at least, transacted business or contracted to supply goods in Delaware within the meaning of the Delaware long-arm statute. Indeed, KVAR contracted with a Delaware entity for the sole purpose of capitalizing on a localized market encompassing only the states of Delaware, Pennsylvania, and Maryland. (D.I. 4, Exh. D.) Under this agreement, KVAR intended to extract from Tri-State – a Delaware entity – a minimum of $25,000 in startup fees plus an additional $75,000 in minimum orders during every three month period throughout the term of the agreement. (D.I. 4, Exh. D at 3.) Although Tri-State would acquire title to ordered goods in Florida, the parties' business relationship demonstrates that KVAR fully intended for those goods to ultimately be present in Delaware. In addition to requiring minimum orders, the parties' agreement called for KVAR to, from time to time, set sales quotas that took into account both the Delaware market potential and Tri-State's previous performance. (Id.) Likewise, KVAR agreed to provide Tri-State with warranty information, which Tri-State would presumably convey to end consumers. (Id.) At least one Delaware court has concluded that this is a critical factor in finding that a defendant has a general presence in

10

Delaware such that general jurisdiction would be established under § 3104(c)(4) of the long-arm statute. See La Nuova D & B, 513 A.2d at 769 ("The warranties, signed in blank by the president of [plaintiff], may be viewed as a 'presence' in this State from the moment they are delivered to [defendant] with authority to deliver them to ultimate purchasers."). In addition to these contacts, it appears that a representative from KVAR, Gregory Taylor, traveled to Delaware on multiple occasions for service/training calls with Tri-State, further demonstrating that KVAR was conducting business in Delaware.[1] See Mid-Atlantic Machine & Fabric, Inc. v. Chesapeake Shipbuilding, Inc., 492 A.2d 250, 255 (Del. Super. Ct. 1985) (finding jurisdiction over a nonresident defendant under § 3104(c)(1) based on an "unspecified number of trips" to Delaware even though the negotiation and execution of the contract occurred in Maryland). Considering the composite whole of the above evidence, the Court concludes that KVAR both transacted business and contracted to supply goods in Delaware.

---

[1] There appears to be some uncertainty as to the precise number of trips that Gregory Taylor made to Delaware. However, KVAR does not explicitly deny that Mr. Taylor made a number of trips to Delaware, choosing instead to give those trips the "benefit of the doubt" for the purpose of its brief. (D.I. 6 at 4.) To the extent there is a factual dispute here, the Court will resolve it in favor of Tri-State for purposes of adjudicating this Motion To Dismiss.

11

KVAR, by contrast, views each act described above in isolation and argues that each of them, taken individually, does not confer jurisdiction. These acts, however, must be viewed not in isolation, but in aggregate within the context of the broader business arrangement contemplated by the parties' distribution agreements. Such an approach is more aligned with the principle that the Delaware long-arm statute is to be construed liberally – to provide jurisdiction to the maximum extent possible – so that Delaware residents have redress against those not subject to service in Delaware.  See Kloth, 494 F.Supp.2d at 278.  Furthermore, and as explained below, the Court concludes that the law relied upon by KVAR to discount its individual Delaware contacts is not well suited to the overall context of this case.

For instance, KVAR relies heavily on Boone for the proposition that because it gave Tri-State the title to KVAR products in Florida, its shipments to Delaware did not constitute an act in Delaware, a rule that originated in the La Nuova case.  See Boone, 724 A.2d at 1156 (citing La Nuova, 513 A.2d 764).  However, both Boone and La Nuova were cases where the claims were not contractual in nature, but were connected to defects in the physical goods, which perhaps justifies a greater emphasis on the precise location where title to the defective goods passed.  Here, however, although Tri-State asserts some

12

tort claims, the core of its complaint is that KVAR breached the distributor agreement. Under these circumstances - where "the claim sought to be asserted ar[ises] from the performance of business or the discharge of [a] contract" - only a single transaction is required to establish jurisdiction. La Nuova D & B, 513 A.2d at 769. As noted above, it appears that in connection with the distribution agreements, a representative of KVAR traveled to Delaware on multiple occasions to oversee and train Tri-State. Against the backdrop of the business plan contemplated by the parties' agreement, La Nuova teaches that this single transaction is enough to put an end to the inquiry and conclude that jurisdiction is established under section (c)(1) of the long-arm statute. See, e.g., Mid-Atlantic Machine,492 A.2d at 255 (finding jurisdiction under section (c)(1) over a defendant that commissioned goods from a Delaware corporation and made an "unspecified number of trips" to Delaware, even though the parties' contract was negotiated and executed in Maryland).

Likewise, in light of the ongoing business relationship contemplated by the parties' agreement, the Court will not disregard KVAR's shipments to Delaware as isolated shipments by "common carrier" or because title passed to Tri-State in Florida. See, e.g., Thorn EMI, 821 F. Supp. at 274 ("In this case, the shipments of allegedly infringing products by

distributors into Delaware and the shipment of free samples are not isolated incidents. They are, rather, part of a general business plan, directed by [defendant], to solicit business in Delaware and deliver products to customers in Delaware."); M&M Techs., Inc. v. Gurtler Chems., Inc., 2005 U.S. Dist. LEXIS 1726 (D. Del. Feb. 8, 2005) ("The court agrees that a party who contracts to have its product distributed throughout the United States is subject to jurisdiction in any state."). This is not a case where KVAR sold goods in Florida to some entity that could then dispose of those goods as it wished without any further involvement from KVAR. Rather, KVAR directed goods specifically to Delaware pursuant to an agreement under which KVAR would extract an ongoing fixed minimum revenue from a Delaware entity, impose sales quotas, distribute warranty information in Delaware, and provide training in Delaware. It would be illogical in these circumstances to disregard KVAR's shipments simply because title passed in Florida, and courts, including those applying Delaware law, have not always done so.

For instance, in Mendelson v. Delaware River & Bay Auth., 56 F. Supp. 2d 436, 439 (D. Del. 1999), a Finnish defendant manufactured a set of doors specifically for a Delaware ferry boat, but agreed to deliver the doors only to Virginia and not Delaware. Although the defendant neither engaged in contractual negotiations in Delaware nor expressly agreed to ship to

Delaware, the court nevertheless exercised jurisdiction under section (c)(2) of the long-arm statute, explaining that the defendant knew the doors would be installed in a vessel moored and anchored in Delaware that would ultimately transport Delaware cars and passengers. Id. As in Mendelson, KVAR was well aware that, pursuant to the distribution agreement, its goods would be shipped to Delaware and put to use in the Delaware market. The mere fact that title to the goods passed in Florida does not negate the fact that KVAR contracted to supply goods in Delaware such that this Court has jurisdiction under section (c)(2) of the long-arm statute. See also Waters v. Deutz Corp., 479 A.2d 273, 275 (Del. 1984) (finding jurisdiction over a German tractor manufacturer that used an exclusive Delaware distributor even though title passed to the tractor in Germany); Moore v. Little Giant Indus., Inc., 513 F. Supp. 1043, 1047 (D. Del. 1981) (finding jurisdiction under section (c)(2) over a manufacturer that undertook to ship a ladder to Delaware and assumed shipping costs even though the shipment was free on board Utah); GB Marketing USA, Inc. v. Gerolsteiner Brunnen GmbH & Co., 782 F. Supp. 763, 768 (W.D.N.Y. 1991) (in applying the New York long arm-statute, finding jurisdiction over a German water supplier that passed title to water in Germany but was not "ignorant of or unconcerned with the water's destination").

**B.   Due Process Clause**

Having determined that the Court has jurisdiction over KVAR under Delaware law, the Court must now determine whether the assertion of jurisdiction under § 3104 comports with federal due process.   "Due process requires that sufficient minimum contacts exist between the defendant and the forum state to satisfy traditional notions of fair play and substantial justice." Thorn EMI, 821 F.Supp. at 275(quotations omitted).   The purpose of this requirement is to ensure that "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there."   World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).   "Courts should also consider the burden imposed on the defendant by having to litigate in a foreign forum, as well as the interest of the plaintiff and the forum state."   Thorn EMI, 821 F.Supp. at 275.   Specific jurisdiction is proper where (1) a defendant has purposefully directed its activities at residents of the forum state, and (2) the alleged injuries arise out of those activities.   Id. at 821 F.Supp. at 275-76 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).

The evidence set forth above establishing jurisdiction under the long-arm statute also establishes that jurisdiction is proper under federal due process.   Indeed, as the Delaware Superior Court explained in Boone, "numerous courts have

concluded that a manufacturer who distributes their product
through a national or regional distributor have established
minimum contacts with the forum state." Boone, 724 A.2d at
1160; see also Asahi Metal Indus. Co. v. Superior Court of Cal.,
480 U.S. 102, 104 (1987) (placing a product into the stream of
commerce "through a distributor who has agreed to serve as the
sales agent in the forum State" constitutes purposeful direction
of activities to the forum state). The Court sees no reason to
deviate from this general rule, especially given that the
parties' distribution agreement is narrowly directed to
Maryland, Delaware, and Pennsylvania. With minimum contacts
having been established, the interests of Tri-State and the
State of Delaware may justify even "serious burdens" on KVAR.
See Asahi, 480 U.S. at 114. However, KVAR has identified
nothing that would constitute a "serious burden" to it
litigating in Delaware.

## II. MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)

In determining whether to transfer a case pursuant to §
1404(a), courts in the Third Circuit apply the public and
private interest factors outlined in Jumara v. State Farm Ins.
Co., 55 F.3d 873 (3d Cir. 1995). With regard to the private
interests, courts consider: (1) the plaintiff's choice of forum;
(2) the defendant's preferred forum; (3) where the claim arose;
(4) the convenience of the parties; (5) the convenience of the

17

witnesses, but only to the extent that the witnesses may be
unavailable for trial in one of the fora; and (6) the location
of books and records, again, only to the extent that they may
not be available in one of the fora. Id. at 879.  With regard to
the public interests, courts consider: (1) the enforceability of
the judgment; (2) practical considerations that could make the
trial easier, quicker, or less expensive; (3) court congestion;
(4) local interest in the controversy; (5) public policies of
the fora; and (6) the trial judge's familiarity with the
applicable state law. Id. at 879-80.

## A.   Plaintiff's Choice Of Forum And The Forum Selection
      Clause In The NDA

The plaintiff's choice of forum is entitled to "paramount
consideration." Shutte v. Armco Steel Corp., 431 F.2d 22, 25
(3d Cir. 1970).  "[I]f the plaintiff's choice of forum relates
to its legitimate, rational concerns then the plaintiff's choice
of forum is . . . accorded substantial weight." Waste
Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F.Supp. 759,
764 (D. Del. 1991).

KVAR points repeatedly to the forum selection clause in the
NDA signed by both Gillen and Chieffo, arguing that the NDA is
"related to" the current dispute and that its forum selection
clause thus requires Tri-State to litigate in Florida.  (D.I. 4
at 18-22.)  According to KVAR, this defeats the strong
preference for Tri-State's choice of forum.  The Court is

18

unpersuaded. As noted above, although Tri-State asserts tort

claims, Tri-State's claims arise predominantly from a perceived

breach by KVAR of the distribution agreement. Indeed, the first

paragraph of Tri-State's complaint is as follows:

> 1.    Defendant entered into an exclusive
> regional distributions agreement with Plaintiff on May
> 5, 2006 and have breached that agreement in violation
> of the Plaintiff's exclusive regional distribution
> agreement, from violating their exclusive distribution
> agreement and from libel and slander and to recover
> damages.

(D.I. 1, Exh. A ¶ 1.) The statement of facts in the Complaint

then describes the formation of the exclusive distributorship

agreement and KVAR's alleged breach of the agreement through the

acquisition of additional distributors in the region covered by

the distributorship agreement. (Id. ¶¶ 6-15.) Furthermore, to

the extent Tri-State asserts tort claims, those claims appear to

be related KVAR's actions in connection with their decision to

no longer using Tri-State as an exclusive distributor.

In the Court's view, the NDAs signed by Chieffo and Gillen,

and relied upon by KVAR to support a transfer, are simply not

related to the issues raised in the Complaint. Indeed, the NDA

calls for Tri-State to hold "in confidence" such things as

KVAR's "energy-savings ideas, procedures, and equipment, as well

as KVAR's prospective customer list, and KVAR's marketing

concepts, techniques, and its contracts and other documents."

(D.I. 4, Exh. B.) Under the NDA, Tri-State is limited to using

19

"Confidential Information" only to evaluate KVAR products,
services, or any proposed business transaction, and is precluded
from otherwise disclosing or publishing such information. (Id.)
Thus, rather than setting the terms of a distribution
relationship, the NDAs are directed to the separate and distinct
task of protecting KVAR confidential information. Indeed,
Gillen, who is not a party in this case, was asked to sign the
NDA prior to having any meetings with KVAR regarding a possible
distribution agreement and before Tri-State, which is a party to
this case, even existed. Though Chieffo signed the agreement
after Tri-State was created, the Court is not persuaded that
this requires Tri-State to litigate its claims in Florida.
Chieffo's NDA includes no reference to Tri-State or any
suggestion that Chieffo signed it in his capacity as a Tri-State
employee. By contrast, the distribution agreement is explicitly
between Tri-State and KVAR, and includes a merger clause
explaining that it "contains the entire agreement of the parties
regarding the subject matter of this agreement." (D.I. 4, Exh.
D at 6.) In these circumstances, the Court cannot find, as KVAR
contends, that the NDAs "formed the basis of the KVAR-Tri-State
relationship." (D.I. 4 at 20.)

The cases cited by KVAR do not support the proposition that the NDA is "related to" the instant dispute either. In Wyeth & Brother Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1075 (3d Cir. 1997), the complaint specifically sought unreimbursed expenses under the very agreement that contained the forum selection clause and that defendant was relying upon as a defense. Similarly, in Schering Corp. v. First Databank, Inc., 479 F.Supp.2d 468, 470-71 (D.N.J. 2007), the defendant drew its defense from the agreement containing the forum selection clause. Here, KVAR does not rely upon the NDA as a defense, but only for the counterclaims that it is asserting in Florida. Neither Wyeth & Brother nor Schering stand for the general proposition that a defendant may assert counterclaims pertaining to some agreement with a forum selection clause as a means of defeating the Court's jurisdiction over the plaintiff's opening claims. Finally, in Source Buying Group, Inc. v. Block Vision, Inc., No. 99-CV-5412, 2000 U.S. Dist. LEXIS 494, at *6-*7 (E.D. Pa. Jan. 14, 2000), the court transferred a case where the dispute "inseparably implicated" both a promissory note and a separate agreement, only the latter of which included a forum selection clause that unquestionably bound the parties. Id. In fact, the court in Block Vision held that the interpretation of a price adjusting provision of the agreement was "essential" to resolving the dispute. As explained above, the NDA and

21

distribution agreements in the present dispute are not so
intertwined, and it is unlikely that the Court will need to
resort to the NDAs to resolve Tri-State's claims, which pertain
to the distribution agreements.  Accordingly, the Court
concludes that the forum selection clause does not defeat the
preference for Tri-State's choice of forum.

KVAR further contends that Tri-State's Delaware filing is
not entitled to "first filed" status because it represents a
bad-faith, preemptive filing designed to avoid litigating in
Florida.  (D.I. 4 at 22-24.)  In support of this contention, KVAR
points to Tri-State's delay in commencing service and the
alleged "bare bones" nature of its complaint as evidence that
Tri-State was wholly unprepared to file suit when it did.  (D.I.
4 at 2, 22-23.)  However, this is insufficient evidence for the
Court to conclude that KVAR's filing was motivated by bad faith,
such that Tri-State's choice of forum should be disregarded.

Ultimately, the Court finds no compelling reason not to
believe that Tri-State's decision to litigate in Delaware simply
reflects a reasonable decision to litigate near its home in
Delaware.  Thus, to prevail on its Motion, Defendants must prove
that the public and private interest factors strongly favor
transfer.

## B. The Remaining Private And Public Interest Factors

KVAR identifies only one remaining private interest factor that favors litigation in Florida. Specifically, KVAR contends that its preference for litigating in Florida favors transfer. (D.I. 4 at 24.) However, the Court concludes that the weight of this factor is overshadowed by the "paramount consideration" given Tri-State's preference for litigating in Delaware.

With respect to the public interest factors, KVAR first contends that the choice of law provision in the distribution agreements mandates that this dispute will be governed by Florida law and that a Florida court will be more familiar with such law. (Id. at 25-26.) While this consideration may favor transfer, it does so only slightly because the legal issues here are straightforward. See Memminger v. Infocure Corp., No. 00-707-JJF, 2000 U.S. Dist. LEXIS 22077, at *19-*20 (D. Del. Nov. 14, 2000). Finally, KVAR contends that practical considerations militate in favor of transfer, arguing that if this case is not transferred to Florida, the parties will have to litigate in both Delaware and Florida, and that the Florida action should be favored because KVAR's Florida complaint is "very comprehensive." (Id. at 26.) However, KVAR cites no case suggesting that a first-filed case should be transferred simply because a defendant has later filed what it believes to be a

more thorough and meritorious set of allegations in an another forum.

KVAR identifies no other public or private interest factor that it contends weighs in favor of transfer. Although the familiarity of a Florida court with legal principles that may be applied in this case tilts slightly in favor of transfer, the Court concludes that the remaining public and private interest factors do not weigh strongly enough to disturb Tri-State's choice of forum.

## CONCLUSION

For the reasons discussed the Court will deny Defendant's Motion To Dismiss.

An appropriate Order will be entered.